## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **WILLIAM NAGLE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 05 C 7039** |
| ) | |
| **VILLAGE OF CALUMET PARK,** ) | |
| **MARK DAVIS, SUSAN J. ROCKETT,** ) | |
| **BUSTER B. PORCH, MELVIN DAVIS,** ) | |
| **and JOHN RIGONI,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

William Nagle began working as a police officer for the Village of Calumet Park Police

Department in 1978 and is still employed by the Department as a police officer. In this case,

Nagle challenges various adverse actions that he has experienced since late 2003, including

changes in his work responsibilities and several short suspensions. Nagle contends that these

adverse actions were taken due to his Caucasian race, his age, his filing of EEOC complaints and

this lawsuit, and his exercise of his constitutional right to free speech. Nagle has sued the

Village under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in

Employment Act and has sued the Village and several of its officials under 42 U.S.C. § 1983.

The defendants have moved for summary judgment. For the following reasons, the Court grants

the motion in part and denies it in part.

**Facts**

Because defendants have moved for summary judgment, the Court views the facts in the light most favorable to the plaintiff and draws reasonable inferences in his favor. *See, e.g., Carreon v. Ill. Dep't of Human Svcs.,* 395 F.3d 786, 790 (7th Cir. 2005).

Nagle, who is Caucasian, is currently fifty-four years old. On November 15, 1978, he began working as a police officer for the Calumet Park Police Department. In the early 1980s, he helped form the local union that represents Calumet Park police officers. Since that time, Nagle has served in various roles within the union. During the period relevant to the allegations in his amended complaint, Nagle served as the union's vice-president and later as the safety and grievance officer. Between 2002 and the date he filed this suit, Nagle filed over one hundred grievances, most of which were "lodge grievances" filed on behalf of the union's collective membership.

In August 2002, Calumet Park Mayor Buster Porch appointed Mark Davis, a fifty-nine-year-old African-American man, as chief of police. In December 2003, Chief Davis appointed Susan Rockett, a forty-eight-year-old white woman, as assistant chief of police. Since Chief Davis' appointment, the Department has employed white individuals in other high-ranking positions such as Sergeant and continues to hire white officers.

Nagle alleges that he has been discriminated against based on his age and race since Chief Davis came to the Department. Nagle recounts several incidents that he claims demonstrate Davis' discriminatory attitude. At a retirement party for a fellow officer in 2002, Chief Davis asked Nagle when he was going to retire. At the time, Nagle believed that Davis was just making friendly conversation, as it is common for police officers to discuss retirement

plans.

In May 2004, a prisoner escaped after Nagle had placed him in custody. During a discussion of the incident with Chief Davis, Davis suggested that Nagle was getting too old for the job and that he may need more training in apprehending and handcuffing prisoners.

Officer Jerri Wilson-Spearman testified that approximately fifteen times over a three year period, she heard Davis say words to the effect that "these white mothers are used to the way things were, but it's going to be a change around here."

Nagle alleges that in October 2005, Robert Smith and Robert Scholl[1] told him that Robert Talaski, the Village's public works superintendent, told Phil Laskey, a Village trustee, that he overheard Chief Davis say to Commander Melvin Davis, "f--- those old white cops." Nagle was not present when this alleged conversation occurred and does not know either the context of the alleged remarks or whether Chief Davis was talking about him.

Robert Talaski testified that around the same time, he heard a man say "these old white cops aren't going to push me around" while at a training seminar at the village hall. Talaski cannot say, however, who made the remark; he did not recognize the voice as that of Chief Davis or anyone from the Department.

Roger Smith, a Village employee, testified that Talaski told him that the Chief said "that the white police officers weren't running this department" *or* that Talaski told him that *somebody else* told Talaski that the Chief made that remark. Smith could not remember one way or the other.

---

[1]    Nagle does not identify in his statement of facts where Robert Smith, Robert Scholl, or Linda Krewicki (referenced later in the text) work or their relation to the parties, nor did he attach pages from their deposition transcripts that likely would include that information.

Linda Krewicki testified that she heard Chief Davis say "f--- Nagle" on numerous occasions. She never heard the Chief make any comments about Nagle's age or race.

Commander Davis (not to be confused with Chief Davis) made a notation next to the name of a potential lateral transfer stating "? Age." He testified that he made the notation because he "had a question to the Board [of Trustees] if they would be interested in interviewing [the candidate] because of his age," which was 59. Nagle claims that Commander Davis' notation shows an age-based bias within the Department.

Finally, Chief Davis authored a work of fiction, entitled *Race Traitors*, which was published in 2005. In the book, a character says, "DoubleA thought programs like affirmative action lowered the bar so that Blacks could receive positions they did not deserve . . . DoubleA did not see the bar being lowered for White candidates who did not demonstrate any better skills than Blacks; yet through political clout, nepotism, and prejudice, Whites have been given the opportunities for hire, assignment, and promotion." Nagle contends that *Race Traitors* is evidence of Chief Davis' discriminatory attitude toward white officers.

Nagle alleges that the individual defendants – Chief Davis, Assistant Chief Rockett, Mayor Porch, Commander Davis, and Sergeant John Rigoni – retaliated against him because he spoke out on matters of public concern at the Department. On May 12, 2004, Nagle attended a meeting with Chief Davis and several other Department officials to discuss Chief Davis' proposed manpower reductions. Nagle attended the meeting because at the time he was the union's safety and grievance officer. During the meeting, Nagle and other officers expressed concern over the proposed manpower reductions because they believed the reductions would affect officer safety. After the meeting, Chief Davis told Nagle that he had disrespected the

Chief of Police in front of the other officers, and if Nagle ever spoke that way again he would be disciplined. Nagle contends that his later suspensions and assignments were a result of his comments at the May 12, 2004 meeting. Nagle also alleges that he spoke out on matters of public concern at various other times by submitting union grievances regarding manpower, hiring of untrained lateral transfers, broken radios, safety, police coverage, and discrimination.

Nagle claims that he suffered several adverse employment actions as a result of the alleged discrimination and retaliation. In October 2003, Chief Davis assigned Nagle to oversee the Department's evidence room; Nagle believes this assignment was a result of race and age discrimination. In December 2003, Nagle received a reprimand regarding his performance as "officer in charge." When a sergeant is not present for a shift, an officer in charge is in command. In December 2003, Nagle was working as officer in charge when he learned that an officer set to relieve him would not be arriving for two hours. Nagle left at the end of his shift, thereby leaving a gap in coverage. Assistant Chief Rockett wrote a memo criticizing Nagle for leaving his post, and Chief Davis issued a reprimand. According to defendants, Chief Davis removed Nagle as officer in charge after the December 2003 incident because of his inability to make supervisory and command decisions. Nagle claims, however, that he worked as officer in charge numerous times until January 2006, when another officer was appointed.

Nagle has been disciplined on multiple occasions by Chief Davis and other supervisors at the Department, most of them before he filed his EEOC complaints. First, on September 23, 2003, Nagle received a one-day suspension for abusing the Department's sick time policy. Nagle admits that he violated the Department's sick time policy. Second, on May 19, 2004, Nagle was suspended for two days for again abusing the sick time policy. Nagle did not lose any

pay as a result of the two-day suspension. He believes he was suspended because of his race because he "heard" from other officers that black officers, specifically Jerri Wilson-Spearman, were not disciplined for violating the sick time policy. Third, in May 2004, Nagle performed a traffic stop in which the driver was arrested. Nagle handcuffed the driver, but he escaped as Nagle was walking him to a squad car. Chief Davis gave Nagle a written reprimand for allowing the prisoner to escape with his handcuffs on. Nagle suffered no monetary detriment as a result of this incident.

The fourth disciplinary action that Nagle challenges concerns an incident on August 15, 2004, when Nagle and officer William Vaughn responded to a call of a domestic disturbance. Sergeant Rigoni arrived at the scene and went inside the house, while Vaughn and Nagle remained outside. Rigoni claimed that Nagle refused to enter the house and assist because one of the occupants had previously made a citizen's complaint against him. Rigoni recommended to Assistant Chief Rockett that Nagle be terminated for failing to assist a fellow officer. Chief Davis instead imposed a three-day suspension. Nagle contends that he received the suspension as a result of discrimination, contending that Officer Vaughn, who is African-American, also "did nothing" but was not disciplined.

Nagle filed his first complaint with the EEOC on January 19, 2005, alleging age discrimination. The complaint referenced ageist comments by Davis and the suspension regarding the August 19, 2004 incident.

On January 23, 2005, Chief Davis observed Nagle preparing a grievance form during lunch. Davis states that lunch is considered "on duty" time at the Department and that Nagle violated the Department's rules and regulations by preparing the grievance while on duty. On

February 11, 2005, after conducting an investigation and allowing Nagle to submit a memorandum explaining his actions, the Chief suspended Nagle for three days.  Nagle filed his second EEOC charge on February 23, 2005, alleging that he had been suspended due to his age and race and in retaliation for his prior EEOC filing.

In March 2005, Chief Davis and Assistant Chief Rockett created a new position of senior citizen liaison.  This position was created to provide outreach to seniors in the Village, perform well-being checks, and provide other forms of assistance.  Chief Davis initially asked for volunteers to fill the assignment.  After no one came forward, Chief Davis appointed Nagle.  Davis appointed Nagle because he had received a commendation earlier in the year for assisting an elderly Village resident.  Assignment to the senior citizen liaison position did not affect Nagle's rate of pay, working hours, or prospects for advancement.  Nagle believed the senior program was worthwhile, knew he was qualified for the position, and enjoyed the position.  However, Nagle also believed that Chief Davis selected him for the position as a "cruel, ageist joke" because the assignment was made around the time Nagle filed an age discrimination complaint with the EEOC.

On April 23, 2005, Nagle was suspended for five days for violating the Department's sick time policy.  Nagle filed a third EEOC complaint on May 9, 2005, alleging that his suspension and his assignment to the senior citizen liaison position had been imposed due to his age and race and in retaliation for his earlier opposition to discrimination.

In September 2005, Chief Davis created a new detail in which officers from the Department were assigned to patrol the main shopping mall in the village.  Nagle contends that Chief Davis assigned him to the mall detail, and created the detail, because of Nagle's race.  The

majority of Department officers, however, have been assigned to the mall detail. The assignment did not change Nagle's pay or job position; however, he did not like "being stuck at the mall."

Nagle filed the present suit lawsuit on December 14, 2005.

## Discussion

When a district court rules on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Entry of summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

### A.      Section 1983 Retaliation – Count 1

Nagle has made a claim under 42 U.S.C. § 1983 against the Village, Mayor Porch, Chief Davis, Assistant Chief Rockett, Commander Davis, and Sergeant Rigoni, alleging that they retaliated against him for exercising his constitutionally protected right of free speech. To prevail on a section 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived him of a constitutional or federal right. *Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000). To prevail on a claim of retaliation for exercising First Amendment free speech rights, a plaintiff must demonstrate that his speech was constitutionally protected and that the protected speech motivated the defendants' actions. *Vukadinovich v. Bd. of School Trustees of North Newton*, 278 F.3d 693, 699 (7th Cir. 2002).

Nagle complains that the defendants retaliated against him for comments he made during a May 12, 2004 labor management meeting about officer safety and staffing levels. He also

claims that he suffered retaliation for other statements regarding Department hiring and treatment of officers that he raised through union grievances.

A statement is protected under the First Amendment if it is "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). A matter of public concern is one that "relat[es] to any matter of political, social or other concern to the community." *Id.* at 146. By contrast, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.

Nagle's comments during the May 12, 2004 meeting and his union grievances do not involve matters of public concern under *Connick*. Even though police manpower issues and officer safety can affect the public, an employee's speech is not protected when it "concerns a subject of public interest but the expression addresses only the personal effect upon the employee." *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994). Moreover, the First Amendment does "not protect the public employee from workplace retaliation for statements that were intended not to alter public opinion or beliefs, but merely to resolve a personal grievance on favorable terms." *Connick*, 461 U.S. at 146-47. In this case, Nagle's speech was intended to influence working conditions for himself and his fellow officers. That is, after all, the primary purpose of labor unions. No reasonable jury could find that Nagle's statements involved "matter[s] of political, social, or other concern to the community"

protected by the First Amendment. *Connick*, 461 U.S. at 146.[2]

Accordingly, defendants are entitled to summary judgment on Count 1.

**B.      Age and Race Discrimination – Counts 2 and 3**

It is not entirely clear to the Court which actions Nagle intends to challenge in his Title
VII and ADEA discrimination claims. The possibilities include the May 2004 reprimand, the
September 2003, May 2004, August 2004, and February 2004 suspensions, the March 2005
reassignment to the senior citizen liaison position, and the September 2005 assignment to duty at
the shopping mall.

No reasonable jury could find that the reassignments were adverse employment actions
that can form the basis of a Title VII or ADEA claim. *See Washington v. Ill. Dep't of Revenue*,
420 F.3d 658, 660-61 (7th Cir. 2005) ("only severe or pervasive change[s] in the daily
'conditions' of employment may be treated as discriminatory."). Nagle's reprimand did not
entail any loss of pay and thus likewise cannot be considered an actionable adverse action. *See
Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) ("Absent some tangible job
consequences accompanying the reprimands, we decline to broaden the definition of adverse
employment action to include them.").

**1.      Direct evidence**

To prove his age and race discrimination claims, Nagle can proceed under either the

_____

[2] Defendants also argue that Nagle's section 1983 claim fails under a recent Supreme
Court case, *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), in which the Court held that the First
Amendment does not protect speech by public employees made "pursuant to their official
duties." *Id.* at 1960. Defendants' reliance on this case is misplaced. Nagle's statements were
not made pursuant to his duties as a police officer; there is nothing in the record to support the
assertion that Calumet Park patrol officers are required or encouraged to opine on staffing or
safety issues. Rather, Nagle spoke as a representative of the union or on his own behalf.

direct or indirect method of proof.  The direct method of proof permits a plaintiff to show

discrimination by offering one of two types of evidence.  *Rogers v. City of Chicago*, 320 F.3d

748, 754 (7th Cir. 2003).  The first is direct evidence, which allows a reasonable juror to

conclude, without resorting to inference, that an employer terminated the plaintiff for an illegal

reason.  *See Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006).  This type of

evidence "is essentially an 'outright admission' that a challenged action was undertaken for one

of the forbidden reasons covered in Title VII."  *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429,

432 (7th Cir. 2005).  Nagle offers no evidence of this type.

The second type of evidence under the direct method is circumstantial evidence, which

"allows a jury to infer intentional discrimination by the decisionmaker."  *Rogers*, 320 F.3d at

754.  The Seventh Circuit has said that circumstantial evidence of employment discrimination

ordinarily falls into one of three categories:

> suspicious timing, ambiguous statements oral or written, behavior toward or
> comments directed at other employees in the protected group, and other bits and
> pieces from which an inference of discriminatory intent might be drawn [;] . . .
> evidence, whether or not rigorously statistical, that employees similarly situated
> to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever)
> on which an employer is forbidden to base a difference in treatment received
> systematically better treatment [; and] . . . evidence that the plaintiff was qualified
> for the job in question but passed over in favor of (or replaced by) a person not
> having the forbidden characteristic and that the employer's stated reason for the
> difference in treatment is unworthy of belief, a mere pretext for discrimination.

*Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir. 1994); *see also, e.g., Phelan v. Cook*

*County,* 463 F.3d 773, 781 (7th Cir. 2006) (quoting *Troupe*).  Courts apply these same standards

to ADEA claims.  *See, e.g., Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir.

2006).

Nagle contends that Chief Davis' age and race-based comments, coupled with allegedly

systematic favorable treatment of younger and non-Caucasian employees, are sufficient to allow a jury to infer discrimination under the circumstantial evidence branch of the direct method of proof. Pl. Resp. at 10-12. The Court disagrees.

As an initial matter, Nagle's counsel has overstated the evidence in several respects in his brief and statement of facts. First, Nagle states on the first page of his brief that Chief Davis was appointed "to the position of Chief of Police instead of a better qualified white candidate." Pl. Resp. at 1. Nagle apparently believes that, if true, this fact would bolster his circumstantial evidence of discrimination. There is no evidence in the record, however, that even refers to the alleged qualifications of the other candidates for chief of police who the Village considered.

Second, in his statement of facts, Nagle claims that "Porch appointed Mark Davis (black) as chief of Police over a white candidate and a third candidate [Mayor] Porch refused to identify." Pl. Stat. of Facts ¶ 57. Again, Nagle intends to suggest that the Village routinely prefers non-white candidates for jobs over white candidates. Mayor Porch's actual testimony was as follows:

Q:    Okay. Chief Davis was obviously one of the two or three finalists?

A:    Um-hmm.

Q:    Who were the other finalists for the position?

A:    Possibly Assistant Chief Rockett, and I don't know who the third person was.

...

Q:    And you mentioned that there was a third candidate besides Susan Rockett and Chief Davis. Who was the third candidate? Do you remember?

A:    I have no idea at this point.

Porch Dep. at 13-14.  Inability to remember a fact is quite different from refusal to disclose information.

Plaintiff's counsel's most significant overstatements concern comments he attributes to Davis that are, quite simply, inconsistent with the record as counsel has cited it.  Nagle contends that "Chief Davis made comments about Plaintiff's race and age including . . .'these old white cops aren't going to push me around.'"  Pl. Resp. at 11 (citing Pl. Stat. of Facts ¶¶ 43, 45, 46).  In his statement of facts, Nagle states that Robert Talaski overheard Davis make this particular statement.  *See* Pl. Stat. of Facts ¶ 43 (citing Talaski Dep. at 9-10).  Talaski's actual testimony on this subject reads as follows:

> Q:     I'm going to read a sentence to you.  Mr. Nagle asserts that in October of 2005 you told several of your Public Works' employees and trustee, Phil Laskey, that you overheard Chief Davis talking to Commander Davis at the village hall and that Chief Davis stated to Commander Davis, "Fuck those old white cops."  First of all, do you recall saying that?
>
> A:     Not that.
>
> Q:     Do you recall having any conversations with anybody generally along those lines?
>
> A:     There was something I overheard, but not that was stated there.
>
> Q:     When did you overhear something?
>
> A:     There again, I stated that I'm on the fire department, and I was here for a continuing education class in the training room here at the village hall.
>
> Q:     When was that?
>
> A:     Somewhere in October 2005, September.
>
> ...
>
> Q:     And then what happened?

A:     I was sitting in class, and I just overheard a conversation in the hallway.

Q:     And could you identify who was speaking?

A:     No.

Q:     To this day, do you know who was speaking?

A:     No.

Q:     And how many people were speaking?

A:     As far as I know, there was just a couple people in the hallway.

Q:     And what did you overhear?

A:     That these old white cops aren't going to push me around.

Q:     Could you recognize that voice as being the voice of Chief Davis?

A:     No.

Q:     Could you recognize – you have no idea who the speaker was?

A:     No.

Talaski Dep. at 7-10.  This testimony plainly does not support Nagle's claim that Talaski attributed the statement to Davis.

Nagle also states that "Roger Smith testified that Robert Talaski told him and other workers in the public works garage that Chief Davis said 'the white policemen aren't running this department.'"  Pl. Stat. of Facts ¶ 43.  Smith actually testified as follows:

Q:     I understand, but did Talaski tell you that he heard the chief say that, or did Talaski tell you that somebody told him the chief said that?

A:     I honestly don't remember if he said he heard it or somebody told him.

Smith Dep. at 11.  Though the Court views the evidence in the light most favorable to the plaintiff on summary judgment, it is incumbent on counsel to present the facts accurately.  The

14

Court will consider the evidence as it exists, not as plaintiff's counsel would like to see it. *See Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000) ("[A] district court is entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' statements.").

After the Court parses Nagle's allegations of Chief Davis' age and race-based comments to find those that are supported by the record and potentially admissible, Nagle is left with the following: (1) Chief Davis asked Nagle at a retirement party in 2002 when he planned to retire; (2) after Nagle allowed a prisoner to escape with his handcuffs on in May 2004, Chief Davis told Nagle that he may be getting too old for the job and suggested he may need additional training; (3) Officer Wilson-Spearman heard Chief Davis say, in substance, that "these white mothers are used to the way things were, but it's going to change around here" approximately fifteen times over a three year period; and (4) Chief Davis' writings in his book *Race Traitors*.

The Court first notes that items (1) and (2) do not support Nagle's race discrimination claim, as they involve age-related remarks, and that items (3) and (4) do not support his age discrimination claims, as they are race-related comments. The Court will therefore address whether comments (1) and (2) are sufficient to support the age discrimination claim under a direct method / circumstantial evidence theory and whether comments (3) and (4) are sufficient to support the race discrimination claim. Statements indicating a decision maker's bias concerning a plaintiff's race, age, or other protected trait "may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decision-maker . . . and made close in time to the adverse action." *Dandy v. United Parcel Svc., Inc.,* 388 F.3d 263, 272 (7th Cir. 2004).

With regard to his race discrimination claim, Nagle cites no authority supporting the proposition that the statements Davis attributed to a character in his book *Race Traitors* are appropriately considered to be evidence of racial animus on the part of Davis himself. There is nothing to suggest that the book was intended to be autobiographical, that the character was an alter ego of Davis, or that Davis was expressing his own views through the character.

This leaves only the "white mothers" statements that Officer Wilson-Spearman says she heard Chief Davis express as support for Nagle's race discrimination claim. There is no question that statements by a decision maker indicating a bias against a particular racial or ethnic group can be used as circumstantial evidence to support a discrimination claim under the direct method of proof. *See, e.g., Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC,* 464 F.3d 659, 666 (7th Cir. 2006). But Nagle cites no case in which comments of the type made in this case are enough, standing alone, to amount to the type of "convincing mosaic" of evidence needed to permit a plaintiff to avoid summary judgment. *Cf. Walker v. Bd. of Regents of University of Wis.,* 410 F.3d 387, 394 (7th Cir. 2005) ("the key consideration is the totality of these 'pieces of evidence[,] none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff.'" (citation omitted)). Indeed, the Seventh Circuit recently concluded that an employee had not shown a triable issue of discrimination under the direct method even though a supervisor had told her that she was "too old" and "too Polish" several times in the six months preceding her termination. *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 695 (7th Cir. 2006). The court concluded that the comments were not "proximate to [plaintiff's] discharge." *Id.* The same is true in this case.

As for the age discrimination claim, Davis' alleged inquiry to Nagle at a retirement party

in 2002 about when he planned to retire is not appropriately considered as circumstantial evidence of age discrimination. Even assuming Davis' comment is indicative of some age-based animus – which the Court doubts – the inquiry was made at least a year prior to the first of the adverse actions potentially at issue in this case, and two years or more before most of them. This leaves (with regard to the ADEA claim) only Davis' alleged comment to Nagle in connection with the May 2004 escape incident that perhaps he was too old for the job. That comment has no nexus with any of the potentially actionable adverse actions that Nagle challenges; Nagle was only reprimanded, and suffered no tangible loss, in connection with the escape incident. For the reasons discussed with regard to Nagle's race discrimination claim, he cannot sustain an age discrimination claim under the direct method of proof.

> **2.** **Indirect evidence**

Nagle also argues that he can sustain his discrimination claims under the indirect method of proof. To prove a discrimination claim by the indirect method, Nagle has the initial burden of establishing a *prima facie* case with evidence that (1) he is a member of a protected class; (2) he performed reasonably on the job in accord with his employer's legitimate expectations; (3) despite his reasonable performance, he was subjected to an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably by the employer. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also, e.g., Davis v. Con-Way Transp. Central Express, Inc.,* 368 F.3d 776, 784 (7th Cir. 2004). If Nagle meets that burden, the Village must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the Village does so, Nagle bears the burden of providing that the stated reason for the adverse action was pretextual. *Davis,* 368 F.3d at 784.

For present purposes, the Court assumes that Nagle can establish a *prima facie* case of discrimination. The Village has offered non-discriminatory reasons for Nagle's suspensions and removal as officer in charge: he violated Department policies. Indeed, Nagle concedes that he violated Department sick time policies by calling in sick the day before or the day after a day off. Pl's Resp. to Def's Stat. of Facts at ¶¶ 11, 14, 15. Nagle also concedes that he prepared a union grievance while on his lunch hour that resulted in a suspension. *Id.* at ¶¶ 35, 36. Nagle's other suspension was for violating three department rules in connection with his failure to back up another officer on the domestic disturbance call. *Id.* at ¶ 28. His removal as officer in charge resulted from the gap in coverage resulting from Nagle's decision to leave his post. *Id.* at ¶ 18. Because the Village has proffered non-discriminatory reasons for the adverse employment actions, the burden shifts back to Nagle to provide evidence from which a jury could reasonably find that the Village's reasons were pretextual.

In addressing whether a stated reason for an adverse employment action is pretextual, the Seventh Circuit has stated that "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational, in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) (emphasis in original). Nagle points to no evidence of pretext other than to say that "[a]s argued above, Plaintiff has presented evidence sufficient to support a finding of pretext for each of the actions that the Village has taken against the Plaintiff." Pl. Resp. at 18. The argument "above" to which Nagle refers is, apparently, the preceding seventeen pages of his response brief. Though the Court has no obligation to develop Nagle's arguments for him, it has reviewed Nagle's brief and statement

of facts to determine whether Nagle has any evidence of pretext. As the Court has already

discussed, Nagle's evidence of intentional discrimination is insufficient to create a triable issue

of fact. The age and race-related remarks that Nagle cites have no nexus to any of the

challenged employment actions and, therefore, do not support a claim that the Village's actions

were pretextual. Nagle's testimony regarding his own performance do not call into question the

honesty of the Village's stated reasons, especially considering that Nagle has admitted that he

committed many of the rule violations in question (*e.g.*, abusing the sick time policy and drafting

grievances while at work).

The only other potential evidence of pretext Nagle has concerns other employees who,

Nagle claims, are similarly situated to him but were not disciplined for similar infractions. This

argument fails, however, because the employees Nagle points to were not similarly situated.

Nagle claims that an African-American officer, Jerri Wilson-Spearman, was not disciplined for

violating the Department's sick time policy. Officer Wilson-Spearman, however, had been

placed on FMLA leave and therefore was not bound by the same sick time policy as Nagle.[3]

Moreover, Nagle admits that over half the Department has been disciplined for violating the sick

time policy. Nagle also argues that Officer Vaughn, an African-American officer who was with

Nagle on the domestic disturbance call that led to his suspension for inaction, also "did nothing"

but was not disciplined. The undisputed evidence, however, shows that Vaughn did not perform

---

[3] Nagle claims that contrary to the defendants' assertions that Officer Wilson-Spearman was on FMLA leave, Wilson-Spearman testified that she did not believe she was on FMLA leave and had not requested it. This disputed fact is not material, however, because FMLA requires an employer to provide leave if the employee qualifies irrespective of whether the employee formally requests it. *See, e.g., Byrne v. Avon Products, Inc.*, 328 F.3d 379, 382 (7th Cir. 2003) ("It is enough under FMLA if the employer knows of the employee's need for leave; the employee need not mention the statute or demand its benefits.").

similarly to Nagle at the call. Rather, Vaughn entered the house behind Sergeant Rigoni and assisted with handcuffing the suspect. Finally, Nagle has identified no officer serving as officer in charge who left his post and was not disciplined.[4]

In sum, Nagle has failed to offer evidence from which a jury reasonably could find that the Village's reasons for suspending Nagle and removing him as officer in charge were pretextual. The Village is entitled to summary judgment on Counts 2 and 3.

## C.    Retaliation – Count 4

In his amended complaint, Nagle alleges that he suffered retaliation for filing his EEOC complaints on January 19, 2005 and February 23, 2005 and for filing this lawsuit. Am. Compl. ¶¶ 19-20. Specifically, Nagle alleges in his amended complaint that he was given the February 11, 2005 suspension (for preparing a grievance while technically on duty) in retaliation for the January 19, 2005 EEOC charge; that he was assigned to the senior citizen liaison position in retaliation for the February 23, 2005 EEOC charge; and that he was removed from the "officer in charge" position in retaliation for filing this lawsuit. *Id.* In his response to the summary judgment motion, Nagle has abandoned his contention that his removal from the officer in charge assignment was retaliatory. *See* Pl. Mem. at 17. But in the same response, Nagle appears to add to the list of actions he cites as retaliatory; he now also cites his April 2005 suspension for allegedly violating the Department's sick leave policy; the changing of his "court key" date in May 2005; and his assignment to the mall detail in September 2005. *See id.*

A plaintiff claiming retaliation may prove his case by either direct or indirect proof.

_____

[4] The Court also notes that Nagle claims he continued to serve as officer in charge through January 2006. If so, he served in that capacity for years after Davis is claimed to have made the discriminatory comments.

Nagle argues his case only via the direct method. To establish retaliation under the direct method, Nagle must show that (1) he engaged in activity protected by Title VII or the ADEA; (2) he suffered an adverse employment action; and (3) there is a causal link between the two. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). There is no dispute that Nagle engaged in protected activity.

To qualify as actionable retaliation under Title VII or the ADEA, an employer's action must be such that it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Sante Fe Ry. Co. v. White,* 126 S. Ct. 245, 2407 (2006) (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Nagle offers no argument as to how a reasonable jury might find that his assignment to the senior liaison position, the changing of his court key date, or his assignment to detail at the shopping mall meet this standard.[5] As indicated earlier, the senior liaison assignment had no affect on Nagle's pay, work hours, or prospects for advancement, and Nagle testified that he believed the position was worthwhile and enjoyed working in that capacity. And though the changing of his court key date theoretically might have, as Nagle says in his statement of facts, some disruptive effect on his schedule, because he advances no argument as to the actual impact of the change, he has forfeited the point. The same is true of his assignment to duty at the shopping mall. In his statement of facts, Nagle says that he had previously been on street patrol, but he gives no

---

[5] With regard to the court key and shopping mall issues, because Nagle made no mention of these actions in his complaint but instead raised them for the first time in his response to defendants' summary judgment motion, it was incumbent on him – particularly in light of the Village having raised the "adverse action" issue with regard to the senior liaison assignment – to provide some explanation or argument as to how these actions qualified as adverse under *Burlington Northern.* He failed to do so.

explanation either there or in his brief as to why or how a reasonable jury could consider this reassignment to be adverse under *Burlington Northern*.

This leaves the February 2005 and April 2005 suspensions. As to the February suspension, the Court rejects the Village's argument that there is no evidence Chief Davis was aware of Nagle's January 2005 EEOC charge at the relevant time. The EEOC's notice to the Department was addressed to "Mark David [sic]" at the Calumet Park Police Department; though Davis testified that he was unaware of the notice at the time he initiated disciplinary proceedings, a jury could find otherwise and certainly could find that he was aware of the notice at the time he actually imposed the suspension.

Nagle has offered evidence from which a jury reasonably could find a causal connection between his EEOC charges and the two suspensions under the direct method of proof. This is not one of the "rare case[s] in which temporal proximity, without more, establishe[s] a causal connection." *Tomanovich,* 457 F.3d at 665. But Nagle has offered more, arguing that he has a "smoking gun," namely a July 2005 memo by Davis to all sergeants in the Department indicating that he believes that imposition of "adequate[ ] discipline by way of . . . corrective action" would stem the flow of "frivolous grievances," and an undated memorandum by Davis in which he advised officers that "if your work or working conditions . . . become distasteful," the officer may discuss this with supervisory personnel, but "[b]eyond that, . . . your only recourse is to **seek other employment** . . . ." *See* Davis Dep., Exs. 6 & 8 (emphasis in original).

The Village attempts to minimize the significance of these memoranda by noting that, on their face, they appear to concern employee grievances, not EEOC charges. A reasonable jury could find, however, that the memos reflect a generally hostile attitude on Davis' part to "flak"

from employees, one that might indeed lead him to retaliate – even more so if the employee took the grievance even further outside the Department, as Nagle did by involving a federal agency. Though the Village has a straight-faced argument that imposition of the suspensions was motivated only by Nagle's apparently-conceded violations of Department rules, a jury will have to decide whether discipline was imposed because of Nagle's violations or because he wanted to penalize Nagle for filing EEOC charges.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment in part and denies it in part [docket no. 41]. Summary judgment is denied with respect to Count 4 (retaliation) as to plaintiff's February 2005 and April 2005 suspensions. Summary judgment is granted in favor of defendants on all other claims. The Clerk is directed to terminate all defendants other than the Village of Calumet Park.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 18, 2006